In the United States District Court
for the District of Kansas

————————

Case No. 19-cv-01330-TC

————————

KELLY MAR,

*Plaintiff*

v.

CITY OF WICHITA, KANSAS,

*Defendant*

————————

## MEMORANDUM AND ORDER

Plaintiff Kelly Mar works for Defendant City of Wichita, Kansas. Alleging discrimination and retaliation, Mar claims that the City failed to promote her, withheld interdepartmental transfers, and disciplined her unfairly in violation of state and federal law. Doc. 95 at ¶ 4.a. The City has moved for summary judgment on all claims. Doc. 100. For the reasons below, the City's motion for summary judgment is granted, and Mar's motion to supplement her summary judgment briefing, Doc. 143, is denied.

## I

## A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are

1

irrelevant. Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

## B

**1.** Mar is a Chinese American woman who was born in 1962. Doc. 111 at ¶ 8; Doc. 104-1 at 5. She has worked for the Wichita Police Department (WPD) since 1996. Doc. 111 at ¶ 9. Mar began as an officer, was promoted to detective in 2004, and was promoted again to sergeant in 2008. *Id.* at ¶ 10. In 2010, she "self-demoted" to detective, which is the position she has held since then. *Id.*; Doc. 104-1 at 49.

Over the course of her career, Mar has been disciplined several times. Doc. 111 at ¶¶ 31-40 (controverted in irrelevant parts); Doc. 104-15. Except for one incident,[1] this discipline has ranged from verbal counseling to written reprimands. Doc. 111 at ¶¶ 9, 31–40; Doc. 104-15. The conduct addressed has included items like failure to show up

---

[1] In 2014, Mar was terminated after an internal investigation under prior leadership. Doc. 111 at ¶ 9. She prevailed at arbitration and was reinstated. *Id.*

to court to testify and accidents in her police vehicle. Doc. 111 at ¶¶ 31–36; Doc. 104-15. But most often the disciplined conduct has been some form of rude behavior that Mar has exhibited. Doc. 111 at ¶¶ 31–36; Doc. 104-15. From 1997 to 2015, this behavior led to several complaints against Mar, which the Professional Standards Bureau (PSB) "sustained," or determined to be well-founded. The complaints that were found to have merit included conduct where Mar exhibited or engaged in impatient, unprofessional, and inappropriate conduct and comments to coworkers, subordinates, dispatchers, citizens, and hospital personnel. Doc. 111 at ¶ 34 (controverted in irrelevant part).

For example, early in her career, Mar was disciplined for being rude to a dispatcher. Doc. 104-1 at 17. (She had become frustrated with the call quality and used profanity toward the dispatcher. *Id.*) On another occasion, Mar was disciplined for telling a distressed citizen that he was "stupid," "white trash," and that he should come down to the station for her to "kick his ass with one hand tied behind [her] back." *Id.* at 19, 24, 28.

As she developed in her career, Mar's performance evaluations showed improvement in some—but not all—of the areas in which she initially struggled. *See* Doc. 104-1. Importantly, her interpersonal skills continued to generate complaints. *Id.* In 2009, during Mar's brief stint as a sergeant, the department received complaints from several different officers about Mar's lack of patience on the job, and Mar was verbally counseled after she was found "yelling at an officer in the hallway of the station in front of other officers and citizens." *Id.* at 48. In 2010, while still in that role, Mar was again disciplined for making a "rude comment" to a local pastor on the scene of a "business check," an incident to which three church parishioners were witness. *Id.* at 43.

In 2015,[2] Mar's evaluation indicated that she still needed to work on her interpersonal skills. Doc. 111 at ¶ 34 (controverted in irrelevant part). Specifically, that evaluation stated:

> Kelly is a very hard worker, however her communication style is very direct, and blunt which at times is perceived as impatient and confrontational with her fellow workers. In September 2015, she was verbally

---

[2] Mar's personnel file indicates that she was "gone from the Department for about two years and returned to full duty on 8-31-15." Doc. 104-1 at 77.

> counseled . . . about how her voice, tone and intensity
> can cause negative perceptions and/or feedback from
> her co-workers. She has improved since then but it is a
> tendency she will need to guard against in the future.

Doc. 104-1 at 77. And by 2020, Chief Gordon Ramsay had heard from
all of his command staff about Mar's lack of "friendliness" and "deco-
rum," though the precise timing and context of these conversations
remains unclear. Doc. 101-2 at 54:17–56:11; *see also* Doc. 111 at ¶¶ 42,
44–45 (detailing incidents in which command staff had negative inter-
actions with Mar).[3]

Not included in this summary are two disciplinary events, from
2017 and 2018. Mar contends that these two events were improperly
motivated, and they are part of the basis for Mar's claims in this litiga-
tion. In 2017, the WPD received an external complaint about Mar's
conduct at a recruiting event at Wichita State University. Doc. 111 at ¶
35 (controverted in irrelevant part); *see also* Doc. 138-12; Doc. 138-13;
Doc. 138-14. University staff told the WPD that Mar had been rude
and unprofessional during a student presentation. Doc. 111 at ¶ 35; *see
also* Doc. 138-12; Doc. 138-13; Doc. 138-14. The WPD also received
more serious allegations from university staff, which Mar claims were
patently incredible and which she alleges were not made until late in
the investigation. Doc. 111 at ¶¶ 35–36. After investigation, the PSB
found that Mar failed to use good judgment in interacting with the
public (in violation of WPD Policy 3.207(B)) but did not find the more
serious allegations to be true. *See id.* at ¶ 35; Doc. 104-16 (summarizing
accounts). As a result, Mar received a written reprimand. Doc. 111 at
¶¶ 35–37; *see also* Doc. 138-12; Doc. 138-13; Doc. 138-14.

In 2018, one of the university staff members, who was a witness in
the 2017 matter, made a new complaint. Doc. 111 at ¶ 38. That witness
alleged that Mar had shoved her in the WSU law enforcement training
center. *Id.* She also alleged that Mar acted rudely toward students taking
a tour of the training center, when she slammed her office door on
them and commented that officers were not "animals in a cage" to be
gawked at. *Id.* Mar alleges that other members of the WPD have
acknowledged that the complainant is not a credible witness. Doc. 111

---

[3] Plaintiff attempts to controvert these specific events by stating that a jury
need not believe the sworn testimony of the deponents. But she offers no
competing or conflicting evidence.

at ¶ 39. Consistent with that allegation, the internal investigation found that most of the complainant's allegations were unsupported. *Id.* Nonetheless, the investigation did find support for Mar's rude comment, which Mar herself "admitted she had once made" (though she did not specifically admit to making the comment on this particular occasion). Doc. 111 at ¶¶ 39–40; *see also* Doc. 129:19 at 154:15–155:5. Mar was verbally counseled for having been discourteous in violation of WPD Policy 3.302(B). Doc. 111 at ¶ 40 (controverted in irrelevant part).

The summary judgment record also reveals several recent investigations in which the PSB sided with Mar: two from 2019, one from 2018, and one from 2017. Each of these started with complaints from outside the department (one from employees at the city attorney's office and three from citizens not affiliated with the City) alleging that Mar had been rude. *See* Doc. 138-29; Doc. 138-32; Doc. 139-19 at 120:20–121:25. The WPD did *not* discipline Mar for any of these complaints. *See* Doc. 138-29; Doc. 138-32; Doc. 139-19 at 120:20–121:25.

While many had problems with Mar, she had her own problems with the department and its working environment. Mar experienced several incidents that she found difficult and offensive. In the 1990s, for example, one of Mar's coworkers called her "Little China" on several occasions. Doc. 111 at ¶ 26. (That conduct stopped in the 90s, and there is no suggestion that current leadership participated, condoned, or was aware of this nickname. *See id.*; Doc. 104-2 at 150:2-12.) In 2020, a deputy chief invited Mar and other Asian American officers to be photographed as part of a diversity and marketing initiative. Doc. 111 at ¶ 27. More specifically, as Mar alleges, she was invited to a Vietnamese restaurant to take Lunar New Year photos with people in "traditional Asian clothing." *Id.*

Mar also claims that she was once called a "bitch" by a witness. Doc. 111 at ¶ 25. She neither discloses the witness's identity nor cites evidence, but the record suggests this was an external citizen over whom the department had no control. *See id.*; Doc. 139-19 at 120:20–121:6. She has otherwise never been called a name or treated poorly by any WPD employee because of her sex. Doc. 111 at ¶¶ 25, 28. But she has overheard coworkers speaking of other female officers' decision-making skills in a derogatory manner. *Id.* at ¶ 28.

Finally, Mar testified that her coworkers regularly make comments about her age and call her "Mom." Doc. 111 at ¶ 29. Although Mar's

testimony about who has participated in these comments is unclear, she admits there is "no record of an internal or external complaint about this nickname." *Id.*; *see also* Doc. 104-2 at 160:25–161:6.

**2.** In the several years leading up to this suit, Mar applied for promotions back to sergeant, as well as a transfer to the PSB. None were successful.

For any given year, the WPD promotional cycle runs from March 1 through February 28. Doc. 111 at ¶ 13. Detectives interested in promotion to sergeant must apply, after which they take a written test and participate in an interview. *Id.* Applicants are then scored according to a matrix set out in a union contract. *Id.* at ¶ 14. The only factors that determine the score are seniority, performance evaluations from the prior three years, written test scores, and interview scores. *Id.* The applicants are then ranked in descending order of their scores, and when a new sergeant position opens, the next candidate on the list is promoted. *Id.* at ¶¶ 14–15 (controverted in irrelevant part). The union contract does permit the department to "skip" the next ranked candidate on the list, provided that the candidate is given a letter explaining the reasons for the skip. *Id.* at ¶ 15. WPD command staff—which consists of the chief of police, three deputy chiefs, the executive officer, and captains—decides whether to promote or skip. *Id.* at ¶¶ 1, 15.

As relevant to this suit, Mar participated in this process three times. In 2017, she applied and was ranked eighth out of fifteen candidates. Doc. 111 at ¶ 16. That year, the seven candidates above her on the list were promoted; Mar and the remaining candidates were not. *Id.* (controverted in irrelevant part). Those promoted were all over 40 years old, with three of them over age 50. *Id.* Two of the promoted candidates were Asian American. *Id.* All were male. *Id.* Of the applicants, only two were female: Mar and a woman who ranked twelfth out of fifteen. *Id.*

Mar disagrees with the City's contention that she was not skipped during this cycle. She alleges that a position opened on February 3, 2018, three weeks before the promotional cycle closed. Doc. 111 at ¶ 16. Rather than promote Mar, she contends, the City effectively skipped her by declining to fill the position and waiting for the 2018 promotional cycle to begin. *Id.*; *see infra* n.4.

In 2019, she applied and was ranked eleventh out of fourteen candidates. Doc. 111 at ¶ 19. The ten candidates above her were promoted

to sergeant. *Id.* Mar and the remaining candidates were not. *Id.* Five of the ten promoted were over 40, with three of those candidates over 50. *Id.* Mar was the only female applicant in this pool, as well as the only Asian applicant. *Id.* She alleges that three additional sergeant vacancies opened on February 17, 2020—11 days before the promotion cycle closed—and that once again the spots were not filled.[4] *Id.* at ¶¶ 155–57; Doc. 125 at ¶ 155.

Mar believes the City selectively followed its own candidate-selection process in 2017 and 2019. Mar does not challenge the method by which the City created its promotion lists. Doc. 111 at ¶ 24 (acknowledging the calculations used to rank and score candidates were correct). Instead, her concern is the way that the City used the lists to fill spots. Mar argues that she was neither skipped nor promoted in 2017 and 2019 because the City chose to hold open spots that became available rather than promote the remaining applicants on the list. In other words, she contends the City cut off the number of promotions in a way that intentionally excluded Mar without formally skipping her.

In 2020, Mar applied once more. This time she was ranked fourth out of fifteen. Doc. 111 at ¶ 21 (controverted in irrelevant part). And this time she was formally skipped. *Id.* The three candidates above her and seven candidates below were promoted. *Id.* at ¶¶ 21–23. Of those promoted, one was 30 and the other nine were in their 40s and 50s. *See* Docs. 104-6 & 104-7; Doc. 111 at ¶ 23. Mar was one of two female candidates; the other was promoted. *Id.* There were no other Asian applicants. *Id.*; Docs. 104-6 & 104-7. Mar's skip letter explained that leadership did not believe she was ready for the promotion due to "concerns regarding [her] professionalism and positive work-demeanor." Doc. 101-22; *see also* Doc. 101-2 at 54:21–55:1 (Ramsay Dep.) (testifying that it was "unanimous" among Chief Ramsay's command staff that Mar "was not ready" to be promoted); Doc. 139-4 at 111:14–25 (Salcido Dep.) (explaining that Deputy Chief Salcido did not

---

[4] There is testimony to suggest that these were not true vacancies, but rather that "officers transitioning and promoting at the same time" often creates the incorrect appearance of an opening on paper. But there is not conclusive evidence in the record as to whether the alleged openings at the end of the 2017 and 2019 promotional cycles were true vacancies. *See, e.g.*, Doc. 139-6 at 31:3–32:12.

support Mar's 2020 promotion application because "the pattern continued. The multiple complaints.").

Reviewing the prior two years, the skip letter pointed to Mar's 2018 investigation that found Mar had engaged in rude conduct toward a citizen. Doc. 101-22. It also discussed Mar's response to that investigation: she displayed "rude, curt and discourteous" behavior to the officers tasked with counseling her; one of those officers perceived that Mar began to ignore her in work-related social situations;[5] and Mar commented during her counseling meetings that she hates coming to work, does not trust any of her colleagues, and stays only because she needs a job. *Id.* The letter conceded that Mar had improved "in these areas recently" but that to "gain the confidence of management required for a promotion to Sergeant" she would need to demonstrate "[s]ustained improvement across all aspects of [her] professional life." *Id.*

In addition to the promotion decisions for sergeant, Mar alleges that she was unfairly denied selection for the PSB. That department manages investigations of officers who have been accused of violating WPD policy. Doc. 111 at ¶ 5 (controverted in irrelevant part). She twice applied to that unit, in 2017 and 2019. Had she been selected, Mar would have continued as a detective, without a rank promotion. *See id.* at ¶ 17. As with a promotion to sergeant, WPD used a matrix to rank candidates for the PSB. *Id.* But unlike matrices used for promotions, the PSB transfer matrix is guidance only. *Id.* The unit captain may, in consultation with the police chief, select any applicant. *Id.*

Mar takes issue with the 2017 process of selecting a PSB member. In 2017, WPD selected two detectives, a white woman and a white man who were both in their mid-40s, to become members of the PSB. Doc. 111 at ¶ 17. When Mar asked the unit captain why she was not selected, she was told that he was looking for detectives with a less confrontational demeanor, who would take a more collaborative approach. Doc. 111 at ¶ 18. The captain also completed a report that informed Mar that her score on the "oral boards," or interview, could use improvement (she ranked fifth out of eight) and that the PSB's prior findings that she had engaged in unprofessional behavior factored into the denial. Doc. 104-10. Mar contends that the police chief's

---

[5] Mar disputes the underlying fact of whether she ignored this officer at work. *See* Doc. 111 at ¶ 43.

desire to select a woman for at least one of the PSB spots was also a factor. *See* Doc. 139-7 at 36:6–12 (Duff Dep.). She also contends that in 2019 a white male detective with an open investigation was awarded the PSB spot with a delayed start date, pending the closure of his complaint. Doc. 111 at ¶ 18.

In 2019, Mar applied again for a spot on the PSB. Doc. 111 at ¶ 19 (controverted in irrelevant part). That year, the PSB selected only one detective, a white male in his mid-40s. *Id.*; *see also* Doc. 104-7. (The only other candidate who applied, beside Mar, was a 30-year-old white male. Doc. 104-7; Doc. 111 at ¶ 20.) Because there were only three applicants, the union contract permitted foregoing the matrix process—a decision to which each of the candidates agreed. Doc. 111 at ¶ 20. In the absence of the matrix process that she waived, Mar takes issue with how she believes her prior discipline factored into the process versus how much the successful candidate's prior discipline was considered. *Id.* The captain told Mar that she had been a "close second" for the transfer. *Id.*

**3.** Eventually, Mar filed three Kansas Human Rights Commission (KHRC) charges, alleging improper treatment related to her race, sex, and age, as well as retaliation. Doc. 111 at ¶¶ 48–50. She also made internal complaints to the City of disability discrimination[6] and of race, age, and sex discrimination. *Id.* at ¶¶ 52–53 (controverted in irrelevant part). On February 21, 2020, Mar filed an Equal Employment Opportunity Commission (EEOC) charge, for which she received a right to sue letter in May that year.[7] *Id.* at ¶¶ 54–56; Doc. 125 at 12.

In this suit, Mar alleges that the City discriminated and retaliated against her when it failed to promote her to sergeant in 2017, 2019, and 2020; when it failed to select her for a PSB position in 2017 and 2019; and when it investigated and disciplined her in 2017 and 2018. *See* Doc. 95. She contends these actions were taken because of her race, sex, and age. *Id.* Consequently, she brings claims under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act (ADEA),

---

[6] Mar is not pursuing any claims of disability discrimination in this suit. *See* Doc. 95.

[7] The City has withdrawn any arguments related to failure to exhaust administrative remedies. Doc. 125 at 26.

the Kansas Act Against Discrimination (KAAD), and the Kansas Age Discrimination in Employment Act (KADEA). *Id.* at ¶ 4.a.[8]

## II

Mar has sued the City for discrimination and retaliation under Title VII, the ADEA, the KADEA, and the KAAD. For the following reasons, the City is granted summary judgment on each of Mar's claims.

## A

Mar contends that she was discriminated against on the basis of her age, in violation of the ADEA, KADEA, and KAAD.[9] Specifically, she claims that her age was a but-for cause, *see Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009), of several employment-related events.

Plaintiffs may prove age discrimination by either direct or circumstantial evidence. *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). When there is sufficient direct evidence of discriminatory intent, nothing more is required to entitle a plaintiff to present the claim to a jury. *See Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1007 (10th Cir. 1990).

When plaintiffs lack direct evidence of discriminatory intent, they may still proceed to trial on circumstantial evidence if their claims

---

[8] In the Pretrial Order, Plaintiff also alleges national origin discrimination and identifies additional instances of alleged discrimination. Doc. 95 at ¶ 4.1. But her summary judgment response confirms that she is no longer pursuing those claims or theories. Doc. 111 at 53.

[9] The parties do not discuss any difference in analysis among these three statutes. And, indeed, the *McDonnell Douglas* framework applies to claims under each of these laws. *See Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (ADEA); *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) (Title VII & KAAD); *Skerce v. Torgeson Elec. Co.*, 852 F. App'x 357, 360 & n.1 (10th Cir. 2021) (KADEA); *Beech Aircraft Corp. v. Kan. Hum. Rts. Comm'n*, 864 P.2d 1148 (Kan. 1993) (adopting *McDonnell Douglas* for KADEA claims); *see also infra* n.10.

satisfy the *McDonnell Douglas* framework.[10] *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1279 (10th Cir. 2010); *see also Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that analysis, a plaintiff "bears the initial burden of setting forth a prima facie case of discrimination." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998). If satisfied, the burden then shifts to the employer to give a legitimate, non-discriminatory reason for its employment decision. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). And if the employer succeeds, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (quoting *Randle v. City of Aurora*, 69 F.3d 441, 452 (10th Cir. 1995)) (internal quotation marks omitted). Only when a plaintiff demonstrates pretext does he or she get "over the hurdle of summary judgment." *Id.*

---

[10] Mar does not argue that she has direct evidence of discrimination. She asserts that her coworkers called her "Mom"—a nickname that she attributes to her age—but she and the City both focus their summary judgment arguments exclusively on the *McDonnell Douglas* framework. *See Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249–50 (4th Cir. 2015) ("It is left to the plaintiff's discretion whether to proceed by direct and indirect evidence or by means of the *McDonnell Douglas* burden-shifting framework."). Moreover, "[d]irect evidence is evidence, which if believed, proves the existence of a fact in issue *without inference* or presumption." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (emphasis added). In other words, statements that can plausibly be interpreted two different ways—"one discriminatory and the other benign"—are not direct evidence. *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007). Given that the nickname "Mom" might indicate a whole host of characteristics and associations—some age-related and some not—this is circumstantial evidence of age-motivated treatment, at best. And Mar does not attribute this nickname, or any other age-related comments, to supervisors or decisionmakers—or even allege that supervisors or decisionmakers were aware of the coworker comments. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("In order to rely on age related statements, [plaintiff] must show that they were made by a decision maker, and that there was a nexus between the discriminatory statements and the decision to terminate."); *see also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) ("[A]ge-related comments by non-decisionmakers are not material in showing the [defendant]'s action was based on age discrimination.").

11

**1.** Mar complains that age discrimination cost her three different promotions to sergeant, a placement on the PSB unit, and two instances of discipline. Each of her claims fails.

**a.** Mar's first argument is that she was not promoted to sergeant because of her age. To make a prima facie case under the ADEA based on the failure to promote, Mar "must show that [s]he (1) was within the protected age group at the time of the failure to promote; (2) was qualified for promotion; (3) was not promoted; and (4) was passed over for an available promotion in favor of someone younger." *Furr v. AT&T Techs., Inc.*, 824 F.2d 1537, 1542 (10th Cir. 1987).

The City's summary judgment argument as to the prima facie case is quite limited. It does not dispute that Mar was within a protected age category or that she was not promoted. And it fails to clearly provide any evidence or argument to establish that Mar lacked basic qualifications for sergeant. *See* Doc. 101 at 22–25; *see also Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1510–11 (10th Cir. 1997) (noting there is a meaningful difference between the minimal standard of qualification required for purposes of the prima facie test and an employer's particular assessment of an applicant). Thus, the key question is whether Mar can show that the City passed over her in favor of younger candidates.

Under this standard, Mar's 2017 and 2019 promotion claims fail. But, as described below, she has identified sufficient evidence to support a prima facie case of discrimination with regard to her 2020 claim.

In 2017, seven candidates were promoted to sergeant. Three, like Mar, were over 50.[11] The other four were over 40. Mar, at this time, was 55. She does not dispute the method by which candidates were ranked, meaning that there is little significance to the ages of candidates

---

[11] It is not clear whether the other candidates' ages were assessed as of the time of the promotion decisions or as of discovery responses in 2021. Either way, any margin of error is quite limited. *Cf. Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000) (observing that a two-year difference between candidates was "obviously insignificant" for purposes of age-discrimination claim).

who ranked higher than her on the promotion list[12] and were therefore promoted before her.

The same is true for the 2019 promotion cycle, when ten candidates were promoted. Five of them were over 40, with three of those five over the age of 50. Again, Mar does not dispute the rankings of the candidates—only the City's decision not to affirmatively promote or skip her when three spots allegedly opened during the final weeks of the 2019 cycle. In other words, as to the candidates ahead of Mar on the list, she was not (and does not contend that she was) "passed over" in favor of anyone younger.

There is a genuine but irrelevant dispute as to whether, in the final weeks of the 2017 and 2019 cycles, the City intentionally left open additional spots for the next promotional year rather than choosing to either promote or "skip" Mar. But Mar presents no evidence that younger candidates were promoted instead of her. As to 2017, there is no evidence about the ages of the candidates that WPD promoted in the 2018 cycle, which began the following month, and Mar elected not to apply during that cycle. Nor is there any evidence that the City knew in advance whether Mar or anyone else would (or would not) apply for the 2018 cycle or had information that would allow it to prefer the 2018 list over Mar and the remainder of her 2017 cohort. As to 2019, even if the City did hold spots, it filled those three spots promptly during the 2020 cycle that began the next month, with candidates who were 47, 53, and 43. And once again, Mar cannot point to evidence that the City knew in advance who would apply for the 2020 cycle,

---

[12] It is notable that half of those candidates were roughly the same age as Mar and that all were in a protected age category. *Cf. Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000) ("[A] prima facie case of age discrimination requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion, and this inference … cannot be drawn from the replacement of one worker with another worker insignificantly younger." (cleaned up)); *Carlson v. Coors Brewing Co.*, 242 F.3d 387, 2000 WL 1842384, at *2 (10th Cir. Dec. 15, 2000) (affirming district court finding that plaintiffs could not show any intent to discriminate in laying off plaintiffs while retaining some younger employees, where employer implemented merits testing and "Plaintiffs all took the examination, but others, some older and some younger, got higher scores"); *but see Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 558 (10th Cir. 1996) (discussing Supreme Court's rejection of a test requiring replacement by someone outside the protected age group rather than merely by a relatively younger candidate).

who would rank at the top of that list, or what their ages would be. Thus, even if the City effectively skipped Mar in 2017 or 2019, she cannot show that it was for any particular candidate or type of candidate.

Mar has satisfied her burden with regard to the 2020 promotion cycle. At that time, three candidates ahead of Mar on the list were promoted. As mentioned, one was over 50, and the other two were over 40. This time, there is no dispute that Mar was officially skipped in favor of seven candidates lower on the list for her. One of those candidates was 30, and the other six ranged in age between 43 and 58. But the median age of the seven candidates for whom Mar was skipped was only 43, and the average age 45. *See Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1057–58 (10th Cir. 2020) (considering, where "there is no clear one-to-one correspondence between the terminated employees and the new hires" a median age analysis to determine whether "the new hires were materially younger"). Mar, at this time, was 58. She has, then, established a prima facie case of age discrimination for the City's refusal to promote her to sergeant in 2020. *Id.* ("[T]he difference between the median ages of new hires and discharged employees ranged between 12 years and 29 years, depending on the job title. These disparities are sufficient to give rise to an inference of age discrimination.").

**b.** Mar also claims that she has a prima facie case of age discrimination arising from the City's refusal to select her for the PSB in 2017 and 2019. To state a prima facie case, Mar must show that "1) she is a member of the class protected by the ADEA; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class." *Jones*, 617 F.3d at 1279 (cleaned up). The only meaningful dispute between the parties is whether the denial of transfer was an adverse employment action. Specifically, the City suggests that its failure to select Mar for the PSB was not an adverse action because serving in that entity is not a promotion.

While the Tenth Circuit "liberally defines the phrase 'adverse employment action,'" it has not gone so far as to "deem 'a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Jones*, 617 F.3d at 1279. Instead, a qualifying adverse action requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

14

*Id.* In the retaliation context, the Tenth Circuit has observed that whether a transfer or denial of transfer is an adverse employment action hinges on whether a "reasonable employee would find it materially adverse," rather than on whether a given plaintiff held a subjective preference for one department or another. *Brown v. Austin*, 13 F.4th 1079, 1091 (10th Cir. 2021).

Mar contends that not being selected for the PSB caused her to suffer "a reduced opportunity to gain the experiences needed to advance one's career." *See* Doc. 111 at 62. She argues that transfer to the PSB, while not a promotion, is perceived to be an "important career step" for which people compete, because it is a "specialty unit." *Id.* Yet Mar has provided no evidence to support these claims and points to nothing in the summary judgment record that would allow the conclusion that she suffered reduced career opportunities (or that others who were selected realized opportunities that she was allegedly denied), that her own perceptions of the PSB role were shared throughout her workplace, or that a reasonable officer in her position would find the denial of transfer materially adverse. *See id.* (making no other argument and citing no facts or any other materials in the record to support her claims). Thus, Mar has failed to point to any evidence to show that the refusal to transfer her was, in fact, an adverse employment action.

Her invocation of *Semsroth v. City of Wichita*, 304 F. App'x 707 (10th Cir. 2008), is inapposite. The retaliatory transfer in that case consisted of moving the plaintiff into a role universally recognized in her department as the "banishment beat." *See id.* at 720. Mar, unlike the plaintiff in *Semsroth*, does not produce any evidence suggesting that her current position was adversely affected or that remaining in her role without serving as a PSB member was something akin to a banishment.[13]

**c.** The same prima facie requirements apply to Mar's claim that she was investigated and disciplined because of her age. *See Jones*, 617 F.3d

---

[13] Had Mar provided supporting evidence, it is plausible that not being selected for such a position might be sufficient. But even assuming it were, the City would still be entitled to judgment because Mar cannot demonstrate pretext. *See infra* Part II.A.3. (describing the lack of evidence to suggest the City's reasons were not genuine and the lack of argument on the topic of age-based animus).

at 1279. Her claim fails for lack of proof that she was "treated less favorably" than younger employees.

While alleging that other officers were not disciplined or sufficiently disciplined for their misconduct, Mar's evidence does not sufficiently allege that these other officers were younger than her. In fact, she does not even identify all the comparators or provide evidence of their ages.[14] Of the three whose ages can be deduced from the exhibits, they appear to be in their mid-to-late 40s. Two "comparators" are completely unidentified except for their gender (*i.e.*, "male officer"). And Mar does not provide the final comparator's age other than to say that she was "over 50 when she made deputy chief" in some unidentified year prior to Mar's complaints about her disparate treatment. *See* Doc. 104-2 at 110:13-15.

Nor are the three men in their 40s adequate comparators. Mar alleges that these three were not disciplined for their poor conduct, like yelling at a citizen, giving inconsistent statements in an employment matter, and making false statements and mishandling a police investigation. *See* Doc. 111 at 63. But she has not provided enough evidence to show that she was "treated less favorably" than them. For the first two, the conduct to which Mar points did not generate any formal complaints (in contrast to Mar's complained-of discipline, which began with an external citizen complaint both times). For the third, he was investigated and, after a hearing, cleared of one charge (the false statement) and disciplined on a lesser charge (poor judgment in handling the investigation)—not unlike what happened to Mar in 2017 and 2018. Mar has not only failed to show that she was treated less favorably than these individuals, but she has also failed to show that she received less favorable treatment than her younger coworkers generally. Thus, she cannot state a prima facie case. And even if she could,

---

[14] Mar has moved to supplement her summary judgment materials with additional argument and one additional exhibit. Doc. 143. Specifically, Mar seeks to introduce a report showing that the discipline that WPD imposed on "12 officers" was insufficiently harsh. *Id.* Once again, neither the proposed exhibit nor Mar's argument indicates the ages, sexes, or races of these would-be comparators, nor whether these comparators had engaged in any protected conduct like Mar's. Thus, they are not comparators at all. This late filing of irrelevant information will not be permitted, and Mar's motion is denied.

she cannot demonstrate pretext to overcome the City's facially legitimate reasons. *See infra* Part II.A.3.

\* \* \*

Mar's effort to satisfy the prima facie standard is a mixed bag. She fails to satisfy it for her promotion attempts in 2017 and 2019, her PSB transfer attempts, and her discipline in 2017 and 2018. But she has presented sufficient evidence of a prima facie case for her promotion attempt in 2020.

**2.** Moving to the second prong of *McDonnell Douglas*, the City argues that its reasons for denying Mar a promotion or transfer[15] were legitimate. Specifically, the City argues these decisions were made in accordance with objective processes and that, to the extent subjective judgments played a role, those judgments were nondiscriminatory responses to genuine concerns about Mar's behavior. Doc. 101 at 23–26.

Those more subjective judgments focused on Mar's workplace behavior. The reason the City gave for "skipping" Mar in 2020—and the reason the City maintains in this litigation—was that Mar was rude and inappropriate in her interactions not only with coworkers and supervisors but also with the public. The same goes for Mar's application to the PSB in 2017—she was told that PSB wanted someone less confrontational. And in 2019, Mar herself alleges that it was her disciplinary history that prevented her being awarded the PSB role. These are legitimate, nondiscriminatory reasons for an employment decision. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005) ("Poor performance is a quintessentially legitimate and nondiscriminatory reason for termination.").

So, too, with Mar's discipline in 2017 and 2018. The City maintains that it acted properly by thoroughly investigating complaints that originated outside the department. Citizens had alleged that Mar had engaged in unprofessional conduct, destroyed property, and had shoved

---

[15] As explained above, Mar identifies no evidence to support a finding that the failure to select her for the PSB transfer was an adverse action. But even if the record could support a reasonable inference to the contrary, Mar's PSB claims would still be subject to, and fail under, the second and third prongs of the *McDonnell Douglas* framework.

a woman following a dispute. Through those investigations, the City concluded that Mar had not engaged in some of the conduct complained of but that she had shown poor judgment (2017) and had made unprofessional comments to students interested in a law enforcement career (2018). Thus, each complaint was found to be meritorious only in part, and Mar received only light discipline (a written reprimand in 2017 and verbal counseling in 2018). The City has met its burden of showing a legitimate, nondiscriminatory reason for disciplining Mar. *Cf. Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229–30 (10th Cir. 2000) (observing that gross insubordination was a facially valid reason to terminate an employee for purely disciplinary reasons).

**3.** The burden then returns to Mar to demonstrate that these reasons were pretextual. Thus, to proceed to trial she must offer evidence "to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason." *Jones*, 617 F.3d at 1280 (quoting *Bryant*, 432 F.3d at 1125). Evidence of pretext is sufficient when it shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasons that "a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005)).

But courts may not "second guess the business judgment of the employer." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks omitted). That the employer "was mistaken or used poor business judgment" is not sufficient to show that the employer's explanation is unworthy of credibility. *Id.* at 970–71. Thus, a plaintiff must produce evidence that the employer did more than "get it wrong." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). The evidence must indicate that the employer "didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Id.*

Mar cannot carry this burden. There is no dispute that her personnel file contains several instances—dating back to 1997—when Mar was counseled or reprimanded for making inappropriate or profane comments, yelling at subordinates, and responding unprofessionally to citizen requests for assistance. Even setting aside the 2017 and 2018 disciplinary events that Plaintiff argues were really events of discrimination, Mar's record supports leadership's concerns about promoting her. Leadership's concerns with Mar's fitness for new roles were largely

concerned with interpersonal skills—a trait that is at least partially sub-jective. Although "subjective decision making provides an opportunity for unlawful discrimination," *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981), there is no evidence to suggest that unlawful animus in-fected the City's views. To the contrary, many of the complaints against Mar came from people unassociated with the department, meaning that decisionmakers were neither involved in generating the com-plaints nor had any reason to believe that they were improperly moti-vated. In other words, decisionmakers did not rely solely on their own perceptions of Mar's "rude" and "unprofessional" behavior, but also considered the "pattern" of complaints that Mar generated over many years from various citizens.

Moreover, Mar's brief is essentially silent on the topic of age; she does not provide the ages of her "comparators" or argue that there is any indication the City's conduct is pretextual age discrimination. There is simply insufficient evidence to dispute the veracity of the City's proffered reasons for its actions, and Mar does not articulate any basis on which a jury could find otherwise. The City is granted judg-ment on Mar's age-based claims.

**B**

Mar also alleges that she was discriminated against on the basis of race, in violation of Title VII and the KAAD.[16] Unlike her ADEA claims, these claims require only that she show race was a motivating factor in the challenged employment decisions. Mar alleges that the City's refusal to promote her to sergeant, refusal to transfer her to PSB, and decisions to discipline her in 2017 and 2018 were all racially moti-vated. Once again, the evidence is lacking.

**1.** As with her age discrimination claims, Mar does not claim to have direct evidence of race discrimination.[17] Thus, the same *McDonnell*

---

[16] The parties make no arguments specific to the KAAD. And, indeed, the *McDonnell Douglas* burden-shifting analysis for Title VII "likewise applies to [a] KAAD discrimination claim." *Singh*, 936 F.3d at 1037 (10th Cir. 2019); *see also Woods v. Midwest Conveyor Co., Inc.*, 648 P.2d 234, 239 (Kan. 1982) (super-seded in irrelevant part); *supra* n.9.

[17] Again, she identifies an offensive nickname, "Little China," which she acknowledges has not been used in decades and which she does not contend has ever been used by or known to any supervisors or decisionmakers.

*Douglas* standard that governs Mar's age claims governs her race discrimination claims.

To make out a prima facie case of race discrimination, a Title VII claimant alleging a failure to promote must show that "(1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled." *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003). The parties largely agree that Mar can satisfy the first three prongs for all her claims: it is undisputed that Mar's race places her within a protected class; the City does not clearly dispute Mar's basic, objective qualifications for sergeant, *see* Doc. 101 at 22–25; *see also Thomas*, 111 F.3d at 1510–11 (10th Cir. 1997); and there is no dispute that Mar tried three times for a promotion to sergeant.

Mar has only mixed success in satisfying the fourth element. As to the 2020 claim, she adequately establishes that she was skipped in favor of candidates of other races. Thus, Mar has stated a prima face case as to her 2020 promotion bid.

But as to 2017 and 2019, she has not shown that the position was filled after she was rejected. Instead, any vacancies that arose were considered and filled in the next promotion cycle. *See supra* Part II.A.1.a. Mar has not identified any evidence that the City controlled—or could even anticipate—who applied for any spots that rolled over. Moreover, to the extent a spot from 2017 or 2019 was later filled, it was done so only though a new application process in which Mar could have participated (and, in 2020, did participate). She cannot, then, show that she was "rejected" for any filled spot in 2017 or 2019, and only her 2020 claim may proceed.

Mar's race-related claims as to the 2017 and 2019 request to join the PSB fail to satisfy the prima facie standard. To meet that standard, she must show that "(1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). But as noted earlier, Mar has failed to establish that the City's failure to select her for the PSB was "adverse." *See supra* Part II.A.1.b. & n.15. (And even assuming that nonselection for the PSB could constitute an adverse action, Mar's claim still fails because she lacks evidence that the City's reason for its action was pretextual. *See infra* Part II.B.2–3.)

Neither does Mar state a prima facie case of race discrimination related to her discipline. Again, Mar largely fails to allege the races of the six potential comparators whom she identifies. It is doubtful that Mar may validly rely on such a statistically insignificant group of comparators among the WPD's 900 employees. *Cf. Fallis v. Kerr-McGee Corp.*, 944 F.2d 742, 746–47 (10th Cir. 1991) (holding, in case where plaintiff wished to rely on statistical data, that a sample size of nine out of 51 employees carried "little or no probative force"). But even if she could, the evidence still fails to show less favorable treatment. Of the six comparators who she claims received little or no discipline for objectionable conduct, one is Asian, one is African American, and four have no race information directly identified.[18] Thus, Mar has not shown that she was disciplined less favorably than others not in her class. And once again, even if she had, she has not shown that the City's reasons for her discipline were pretextual.

\* \* \*

As to her race claims, Mar has failed to show a prima facie case with regard to her attempted promotion to sergeant in 2017 and 2019, her PSB transfer attempts, and her discipline in 2017 and 2018. But she has adduced sufficient evidence of a prima facie case with regard to her promotion attempt in 2020.

**2.** For the same reasons stated above, the City has met its burden of showing a legitimate nondiscriminatory reason for failing to promote Mar in 2020 or transfer her in 2019. *See supra* Part II.A.2.

**3.** Mar fails to show pretext on her race claims for essentially the same reasons explained above. *See supra* Part II.A.3. Mar's brief is silent as to why she believes the reasons given for her nonselection were pretext for race discrimination. For example, in discussing the 2020 promotional cycle, Mar makes no mention of race, focusing on gender alone. In discussing the 2017 denial of transfer to PSB, she provides no specific arguments for pretext. And for the 2019 PSB denial, Mar's

---

[18] Of these four, Mar identifies two only as "male officer." The other two she identifies by name but does not provide any information about their race.

only specific argument is to compare her multiple disciplinary events with the transferred candidate's single investigation.[19]

The parties' briefs identify two events in which Mar felt singled out due to race. Neither establishes pretext. First, in the 1990s, Mar had a coworker who nicknamed her "Little China." Not only did that conduct cease decades ago, but also (and more importantly) Mar has not alleged that any supervisors or decisionmakers participated in or were even aware of the conduct. *Cf. Cone*, 14 F.3d at 531.

Second, and more recently, Mar was invited to participate in a diversity and marketing initiative, at which Asian American members of the WPD were going to take photographs for the Lunar New Year. As Mar describes that invitation, a reasonable jury could indeed find that it was tone-deaf and offensive. *See* Doc. 111 at ¶ 27. But this single event—which does not speak directly to the veracity of the City's proffered reasons for denying Mar a promotion or transfer—is insufficient to show "such weakness" as to render the City's proffered reasons incredible. *See Stone*, 210 F.3d at 1140 (ADEA context) (observing that "stray remarks," which are "isolated or ambiguous" and "unrelated to the challenged action," are insufficient to create a jury question of pretext); *see also Sasser v. Salt Lake City Corp.*, 772 F. App'x 651, 660 (10th Cir. 2019) (holding that improper statement from "one of four panel members who initially evaluated applicants" was, on its own, insufficient to create a genuine issue of pretext, where that panelist was not the deciding vote and where other panelists had ranked the plaintiff-applicant similarly).

Neither does Mar find help in comparators. In all the years that Mar attempted a promotion to sergeant—in 2017, 2019, and 2020—there were only three Asian candidates who applied for a sergeant position, Mar and two Asian men. Mar was not promoted, but both of the other Asian candidates were (during the 2017 cycle). In other words, the limited evidence provided undermines any inference of an anti-Asian bias among decisionmakers.

_____

[19] Mar does point out, in the facts section, an incident in which the successful candidate conducted himself poorly in speaking with a juvenile detainee. But, notably, the captain who made the 2019 PSB decision was subjectively unaware of that incident, which had occurred five years prior, in 2014, and for which the candidate was disciplined at the time. Doc. 139-11.

Mar also complains that three white men were promoted during these years despite their own disciplinary troubles. But the evidence submitted shows that one of these men was investigated and found not to have violated policy. Another had a single disciplinary event for making an inappropriate sexual joke in the workplace. As a result of that event, he was disciplined and involuntarily transferred out of his department, but he had no further disciplinary issues until promotion. And, most telling, the third of these comparators was "skipped" for a sergeant promotion three times in 2018 before finally earning his promotion in 2019. As explained in his skip letters, he was passed over for promotion for similar reasons as Mar ("rude conduct" and the unnecessary creation of "conflict"), as well as an excessive force incident. Doc. 104-14; Doc. 139-2 at 28.

Finally, Mar argues that she was treated differently than the candidate selected for transfer to PSB in 2019. That candidate was undergoing a PSB investigation at the time, based on a complaint that Mar—not an external citizen—made against him. He was still considered for the position, just with a deferred start date to avoid conflicts while his investigation concluded. Mar attempts to compare that treatment to her own open investigation, which she claims counted against her in 2017. Perhaps, in isolation, this could suggest pretext. But Mar's pending investigation was not the only reason for her 2017 transfer denial. The primary reason the City gave was her confrontational and noncollaborative approach to difficult situations, together with her low interview scores and the numerous complaints against her (both sustained and unsustained) from external, citizen complaints. Doc 104-10. She cannot identify the same wide-ranging difficulties in the successful 2019 candidate's file and points only to the single open investigation.[20]

Mar therefore cannot demonstrate pretext. And the City is granted judgment on her race discrimination claims.

---

[20] Specifically, he was investigated and disciplined for creating a meme that depicted Mar's face superimposed over the face of a British sit-com character (Mr. Bean) and which appears to pit "Detectives" against "Patrol." Mar took offense to this meme and made a complaint. Interpretations of the meme vary, but there is no obvious race, sex, age, or other discriminatory component to the image. And Mar does not argue otherwise. She focuses, instead, on how the officer's discipline and career opportunities proceeded after her complaint, rather than on the content of the meme itself.

## C

Mar's sex-discrimination claims requires a similar analysis. They also proceed under Title VII and the KAAD.[21] And again, the *McDonnell Douglas* burden-shifting framework applies. *See, e.g.*, *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017).

**1.** The elements required to show a prima facie case of sex discrimination for failure to promote are different than for Mar's age or race claims. For failure to promote to sergeant in 2020,[22] Mar must "show that there were promotional opportunities available that were filled by males, that she was qualified for promotion, and that despite her qualifications she was not promoted." *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1362 (10th Cir. 1997). This, Mar has done. *Cf. supra* Part II.B.1.

For the PSB transfers and disciplinary incidents, Mar must show "(i) that she belongs to a protected class; (ii) that she suffered from an adverse employment action; and (iii) that her employer treated similarly situated employees differently." *Semsroth*, 304 F. App'x at 718 (citing *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)). To be similarly situated for purposes of Title VII, employees must "deal with the same supervisor and [be] subject to the same standards governing performance evaluation and discipline." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 922–23 (10th Cir. 2004). But that is not sufficient. Courts "should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).

Mar's attempts to become a member of the PSB in 2017 and 2019 each fail to constitute a prima facie claim. As to the 2017 attempt, her claim fails because another female was selected for one of the two available positions. In 2019, there was only one position open, and it went to a male. Still, neither the 2017 nor the 2019 claim may proceed because there is no evidence that not being selected for the PSB was an adverse action. *See supra* Part II.A.1.b. & n.15. And, even if there

---

[21] See supra n.9.

[22] Mar cannot sustain a claim for the 2017 or 2019 promotional cycles, as explained above. *See supra* Parts II.A.1. & II.B.1.

were, Mar's evidence fails to show that the City's reasons for its action were pretextual. *See infra* Part II.C.2–3.

Mar has, however, satisfied the prima facie elements for her discriminatory discipline claim. Mar lists a handful of events that she believes other officers—four males and one female—should have been investigated or received harsher discipline for, but only one involved an incident similar to Mar's disciplined conduct: a male officer allegedly yelled at a citizen without cause. Unlike with Mar, the citizen did not file a formal complaint. It is arguable whether that is sufficiently analogous, but given the slight hurdle the prima facie elements impose, Mar has adequately established at least one male colleague was not disciplined for yelling at a citizen. *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000).

* * *

Several of Mar's allegations of sex discrimination fail to satisfy the prima facie test. Specifically, her 2017 and 2019 promotion attempts and her PSB claims fail for lack of evidence. Only the 2020 promotion claim and her 2017 and 2019 discipline claims survive for further analysis.

**2.** For the same reasons stated above, the City has met its burden of showing a legitimate, nondiscriminatory reason for failing to promote Mar in 2020 or transfer her in 2019. So, too, with its decisions regarding discipline. *See supra* Part II.A.2.

**3.** Mar has not presented evidence of pretext as to her sex-discrimination claims. As to the 2020 promotion cycle, Mar focuses on the numbers, correctly observing that many men were promoted in cycles when Mar was not. But as the City points out, that picture is incomplete. The applicants were overwhelmingly male and there was therefore no situation in which those promoted were not going to be overwhelmingly male. Mar does not contend that the City discriminated in how it developed those applicant pools. Nor does she complain about the objectivity of the process by which applicants were ranked. She only complains that she was "skipped," either actually or effectively on the basis of her sex. But none of the other, admittedly few, female applicants were "skipped." Nor does Mar identify any comparators who missed promotions to other positions based on their sex. *See supra* Part II.B.3. (discussing potential male comparator who was skipped for essentially the same reasons as Mar).

Neither can Mar identify any indications of sex-based animus in her workplace. She has pointed to criticisms by coworkers of another female detective and about lack of morale among female employees. But she has not provided any evidence that leadership shared, endorsed, or knew about those coworker comments. In fact, in arguing her PSB transfer claim, Mar acknowledged that leadership was actively trying to increase the number of female detectives in departments where they were underrepresented.

Mar theorizes that gendered expectations led coworkers, supervisors, and citizens to perceive her as rude. But she does not provide any evidence to suggest that decisionmakers suspected that these reports against her—from numerous sources over a twenty-year span—were inaccurate or improperly motivated. Overall, she offers no evidence to undermine the legitimacy of the business decisions that the City made in light of Mar's personnel file. *See DePaula*, 859 F.3d at 970. Even if leadership "got it wrong," Mar has not shown that a reasonable jury could conclude they did so out of sex-related animus. *See id.*

The same is true of Mar's discipline in 2017 and 2018. She provides no information about her male comparators that would permit a jury to conclude that they were similarly situated and disparately treated on the basis of sex. Their alleged infractions run the gamut from dishonesty in making tee times at a golf course to alleged inconsistent statements during an investigation into a subordinate. While these employees are presumably subject to the same conduct standards and PSB procedures as Mar, their work histories suggest less troubling disciplinary records than Mar's, and unlike Mar, their identified conduct did not generate an external complaint requiring PSB attention. Moreover, discipline *did* issue in many of those instances. *See* Doc. 139-28; Doc. 139-23 at 27:2–4; Doc. 139-29 at 5, 8. Finally, Mar fails to explain why her discipline—a written reprimand and verbal counseling, two of the least serious forms of discipline that a WPD employee can receive—indicates sex bias rather than a proper response to a citizen complaint.

Mar seems to present a theory that WPD is generally corrupt, unfair, and bent on undermining Mar's career. But she provides no evidence to anchor the City's alleged ill-intent to Mar's sex. *See, e.g.,* Doc. 111 at 63 (providing, for comparison, three events in which Mar feels that another *female* officer was not properly disciplined for various conduct). The City is granted judgment on Mar's sex-based claims.

## D

Finally, Mar generally alleges that all of the above adverse events were in retaliation for her various employment complaints. Doc. 111 at 52–53, 63, 67, 69, 70. This claim again involves the same *McDonnell Douglas* framework. *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 890 (10th Cir. 2018). To state a prima facie case of retaliation, a plaintiff must show that "(1) she engaged in protected opposition to discrimination; (2) her employer took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action." *Id.* (Title VII context).

Mar meets the first two prima facie elements. The City does not dispute that Mar's KHRC and EEOC filings constitute protected opposition. *See* Doc. 101 at 44; Doc. 111 at ¶¶ 48–50, 52–56; Doc. 125 at 12. And Mar has sufficiently shown adverse action by pointing to the discipline she endured and her failure to obtain a promotion to the position of a sergeant.[23]

But Mar fails to establish a causal connection. Three of the City's allegedly retaliatory acts predate any protected conduct: the denial of Mar's 2017 application for promotion to sergeant, the denial of her 2017 request to transfer to PSB, and the 2017 investigation and disciplinary matter. There can be no causal connection between Mar's protected activity and these employment decisions. *See Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1226 (10th Cir. 2016) (ADA retaliation).

Any connection between protected conduct and the other allegedly retaliatory acts (the 2019 and 2020 promotion attempts, the 2019

---

[23] The prima facie elements for retaliation are different than those for Mar's protected-category claims. Here, she need not compare her treatment to that of other employees. An unofficial "skip" or intentional delay of Mar's sergeant application in 2017 or 2019 could arguably have dissuaded a reasonable person from raising concerns, and for Mar's retaliation claims that could suffice so long as a causal connection existed. *See, e.g., Daniels v. United Parcel Serv.*, 701 F.3d 620, 637–38 (10th Cir. 2012) (defining materially adverse action, in retaliation context, as that which could "dissuade a reasonable worker from making or supporting a charge of discrimination"). Although Mar's PSB allegations suffer from the same evidentiary deficits described above, *see supra* Part II.A.1.b. & n.15, even if she could show that her nonselection was materially adverse, it would not change the analysis because she has no evidence that the City's proffered reasons were pretextual.

application to PSB, and the 2018 discipline) is supported by nothing more than speculation. Indeed, Mar merely suggests that "discrimination and retaliation are the best explanations for what has occurred." *See, e.g.*, Doc. 111 at 71. That is not enough. *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (observing that a prima facie case of retaliation requires more than "speculation, conjecture, or surmise").

At best, it appears that Mar may be implying a temporal connection between events to create an inference of retaliation. But temporal proximity alone cannot show a causal connection unless the events are very close in time. *See, e.g.*, *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1156–57 (10th Cir. 2008) (approving, in ADA discrimination case, prima facie showing based on "close temporal proximity" of three weeks and six weeks); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("A retaliatory motive may be inferred when an adverse action closely follows protected activity. However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence . . . . [W]e have held that a three-month period, standing alone, is insufficient to establish causation.") (internal citation omitted).

The evidence of temporal proximity does not yield a clear conclusion as to the prima facie evidence. As to Mar's administrative charges in May 2018, August 2018, December 2019, and February 2020, the timing is ambiguous at best. Mar's 2018 investigation and discipline began with an external complaint against Mar in June 2018 but was not completed, and the discipline was not imposed, until March 2019—making any temporal relationship with Mar's May 2018 and August 2018 complaints unclear. Mar claims she was unofficially skipped for a sergeant promotion in February 2020, after filing a complaint in December 2019, and officially skipped in late April 2020, after filing a complaint in late February. Each of these presents a two-month interval, and the Tenth Circuit has expressly declined to decide whether a two-month interval is sufficiently proximate. *See Anderson*, 181 F.3d at 1179. Finally, neither party identifies exactly when in 2019 the PSB transfer decision was made. Thus, any temporal proximity is ambiguous and attenuated.

But even assuming that Mar satisfies the prima facie test, she has offered no explanation of why pretext would be a more likely explanation than the ones the City offers. She provides no argument or evidence specific to retaliation, asserting only that it is, in her opinion, the "best explanation" for the City's conduct. Doc. 111 at 71. But as

repeatedly noted above, the City presents numerous examples of Mar's interpersonal difficulties and lack of leadership abilities as the basis for its decision and Mar has provided no facts capable of undermining those reasons. *See id.* In other words, Mar cannot show pretext that any reasonable jury would accept, and for the same reasons set out above, the City is granted judgment on Mar's retaliation claims.

### III

For the reasons set forth above, the City's motion for summary judgment, Doc. 100, is GRANTED, and Mar's motion to supplement, Doc. 143, is DENIED.

It is so ordered.


Date:  June 21, 2022         s/ Toby Crouse
                             Toby Crouse
                             United States District Judge